# IN THE SUPREME COURT OF CALIFORNIA

NATIONAL LAWYERS GUILD,
SAN FRANCISCO BAY AREA CHAPTER,
Plaintiff and Respondent,
v.
CITY OF HAYWARD et al.,
Defendants and Appellants.

S252445

First Appellate District, Division Three
A149328

Alameda County Superior Court
RG15785743

May 28, 2020

Justice Kruger authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu,
Cuéllar, Groban concurred.

Justice Cuéllar filed a concurring opinion.

NATIONAL LAWYERS GUILD v. CITY OF HAYWARD

S252445


Opinion of the Court by Kruger, J.


This case concerns the costs provisions of the California Public Records Act (Gov. Code, § 6250 et seq.).  As a general rule, a person who requests a copy of a government record under the act must pay only the costs of duplicating the record, and not other ancillary costs, such as the costs of redacting material that is statutorily exempt from public disclosure.  (*Id.*, § 6253, subd. (b); *id.*, § 6253.9, subd. (a)(2); see *County of Santa Clara v. Superior Court* (2009) 170 Cal.App.4th 1301, 1336 (*County of Santa Clara*).)  But a special costs provision specific to electronic records, Government Code section 6253.9, subdivision (b)(2), says that in addition to paying for duplication costs, requesters must pay for the costs of producing copies of electronic records if producing the copies "would require data compilation, extraction, or programming."  Here, the City of Hayward seeks to charge a records requester for approximately 40 hours its employees spent editing out exempt material from digital police body camera footage.  The City claims that these costs are chargeable as costs of data extraction under section 6253.9, subdivision (b)(2).  We conclude the term "data extraction" does not cover the process of redacting exempt material from otherwise disclosable electronic records.  The usual rule therefore applies, and the City must bear its own redaction costs.

1

## I.

## A.

The California Public Records Act (PRA or Act) establishes a right of public access to government records. "Modeled after the federal Freedom of Information Act (5 U.S.C. § 552 et seq.), the PRA was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies." (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 290.) In enacting the statute in 1968, the Legislature declared this right of access to be "a fundamental and necessary right of every person in this state" (Gov. Code, § 6250)—a declaration ratified by voters who amended the California Constitution in 2004 to secure a "right of access to information concerning the conduct of the people's business" (Cal. Const., art. I, § 3, subd. (b)(1), added by Prop. 59, Gen. Elec. (Nov. 2, 2004)). (See *Los Angeles County Bd. of Supervisors*, at p. 290.)

The Legislature that enacted the PRA recognized that increased access to government information can have both intangible and tangible costs, and it crafted the PRA accordingly. First, and most important, the Legislature recognized that increased public access to government records can come at the expense of personal privacy and other important confidentiality interests. To mitigate these sorts of intangible costs, the Legislature crafted "numerous exceptions to the [PRA's] requirement of public disclosure." (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 329, citing Gov. Code, § 6254.) The PRA's exemptions permit public agencies to withhold a variety of records—or reasonably

segregable portions of records—to protect confidential information. (Gov. Code, §§ 6253, subd. (a), 6254.) Many of these exemptions "are designed to protect individual privacy" (*International Federation*, at p. 329)—for example, the exemption for "[p]ersonnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy" (Gov. Code, § 6254, subd. (c)). But the exemptions are designed to protect other interests as well, including, for example, the interest in law enforcement's ability to effectively perform its duties. (See *id.*, § 6254, subd. (f) [exempting "[r]ecords of complaints to, or investigations conducted by, or records of intelligence information or security procedures of . . . any state or local police agency"].)

At the same time, the Legislature also recognized that increased public access to government information has costs of the more tangible, dollars-and-cents variety. Before providing access to requested records, public agencies need to locate and collect records, determine which records are responsive, determine whether any portions of responsive records are exempt from disclosure, convert the records into a reviewable format, and, if requested, create a copy of the record. To complete these tasks generally requires personnel time as well as the use of office equipment and supplies—all of which comes with a price tag. The PRA acknowledges as much and allocates certain costs to the requester, while others must be borne by the agency responding to the requests.

Precisely which costs may be allocated to the requester depends on the format of the requested record. Since 2000, the PRA has distinguished between nonelectronic records (sometimes referred to as "paper records," though the record may be in another nonelectronic medium, such as audiotape)

and electronic records.  Paper records are governed by a general costs provision, enacted in its earliest form by the original statute in 1968.  (Gov. Code, former § 6257, added by Stats. 1968, ch. 1473, § 39, pp. 2947–2948.)  Under that provision, today codified in Government Code section 6253, subdivision (b), a person requesting copies of a government record must pay "fees covering direct costs of duplication, or a statutory fee if applicable."  (*Id.*, § 6253, subd. (b).)  The reference to "direct costs of duplication" has long been understood to cover "the 'cost of running the copy machine, and conceivably also the expense of the person operating it' while excluding any charge for 'the ancillary tasks necessarily associated with the retrieval, inspection and handling of the file from which the copy is extracted.' " (*County of Santa Clara*, *supra*, 170 Cal.App.4th at p. 1336, quoting *North County Parents Organization v. Department of Education* (1994) 23 Cal.App.4th 144, 148 (*North County*).)  Nonchargeable ancillary costs include "staff time involved in searching the records, reviewing records for information exempt from disclosure under law, and deleting such exempt information." (*North County*, at p. 146.)[1]  At least with respect to nonelectronic records, then, requesters are required to pay "direct" duplication costs, but they are not required to pay the government agencies' costs of redacting the record.

---

[1]    The *North County* court interpreted the term "direct costs of duplication" in Government Code former section 6257 (repealed by Stats. 1998, ch. 620, § 10, p. 4121).  Government Code section 6253, subdivision (b) replaced section 6257 and uses substantially similar language.  (Stats. 1998, ch. 620, § 5, p. 4120 [enacting § 6253].)

Before the statute was amended in 2000, there were no special rules for records kept in electronic format. Agencies had wide discretion to produce electronic records "in a form determined by the agency"—that is, in any form the agency saw fit. (Gov. Code, former § 6253, subd. (b), added by Stats. 1998, ch. 620, § 5, p. 4120.) Exercising this discretion, many agencies chose to print out their electronic records and produce them in paper format. This approach allowed the agencies to recover the direct costs of duplicating the paper copies, even though producing duplicates of the records in an electronic format would have been significantly cheaper. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as amended June 22, 2000, p. 3.)

To account for differences in the costs of producing electronic versus paper records, the 2000 amendment introduced specific rules for the production of records held in electronic format. (Stats. 2000, ch. 982, § 2, p. 7142; see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as amended June 22, 2000, pp. 3–4.) In newly added Government Code section 6253.9 (section 6253.9), the Legislature cabined agencies' discretion by requiring them to make nonexempt electronic records available in "any electronic format in which [the agency] holds the information." (§ 6253.9, subd. (a)(1), added by Stats. 2000, ch. 982, § 2, p. 7142.) The amendment also created cost shifting rules specific to the production of copies of electronic records. (Stats. 2000, ch. 982, § 2, p. 7142.)

After the 2000 amendments, the ordinary rule is the same for electronic records as paper records: Requesters must pay direct duplication costs (although the statute now specifies that in the case of electronic records, the "cost of duplication shall be

limited to the direct cost of producing a copy of a record in an electronic format"). (§ 6253.9, subd. (a)(2).) But the statute provides an exception specific to electronic records: Notwithstanding the usual limitations on chargeable costs, "the requester shall bear the cost of producing a copy of the record, including the cost to construct a record, and the cost of programming and computer services necessary to produce a copy of the record" if one of two conditions applies. (*Id.*, subd. (b).) First, the requester must pay these additional costs if "the public agency would be required to produce a copy of an electronic record and the record is one that is produced only at otherwise regularly scheduled intervals." (*Id.*, subd. (b)(1).) Second, the requester must pay the costs if "[t]he request would require data compilation, extraction, or programming to produce the record." (*Id.*, subd. (b)(2).) This case concerns the latter condition.

## B.

In December 2014, demonstrations erupted in Berkeley, protesting grand jury decisions not to indict the police officers involved in the deaths of Eric Garner and Michael Brown, both unarmed African-American men. The Hayward Police Department provided mutual aid to the City of Berkeley in policing the demonstrations. After the demonstrations were over, plaintiff National Lawyers Guild, San Francisco Bay Area Chapter (NLG) submitted a public records request to the Department, seeking 11 categories of records relating to the Department's actions in policing the demonstrations. The requested records included relevant communications made during the demonstrations, operations and command center logs, and various reports, as well as records identifying supervisory and command officers who had approved certain

police tactics used at the demonstrations and records relating to the use of those tactics. Soon after, NLG submitted a followup request for related records.

The Department's Records Administrator and Custodian of Records, Adam Perez, was responsible for identifying records responsive to the requests. For both requests, Perez first identified responsive text-based electronic records, such as written reports, logs, operational plans, and e-mails. He reviewed these documents for potential exemptions under the PRA and redacted them accordingly. He then converted the documents to portable document format (PDF), and they were e-mailed to NLG. NLG was never charged the costs to produce the copies of these text-based electronic records.

Perez next identified other types of electronic records potentially responsive to NLG's requests. Several Hayward officers policing the demonstrations were equipped with body-worn cameras. Though NLG had not explicitly requested videos from these cameras, Perez believed certain videos might be responsive. In the City of Hayward, police officers upload digital video from their body-worn cameras to an online digital evidence management system known as Evidence.com, which stores videos and other digital evidence on the Internet. From Evidence.com, videos can be downloaded in MP4 format to DVDs for production, storage, or other uses. On average the City collects more than 1,000 hours of body-worn camera video per month.

Because Perez did not have access to Evidence.com, he asked the City's Information Technology Manager of Public Safety, Nathaniel Roush, to search Evidence.com for videos responsive to NLG's requests. Perez provided Roush with 15

search criteria, and Roush searched Evidence.com using these criteria, identifying 141 videos totaling approximately 90 hours. Roush quickly reviewed the videos, downloaded them to DVDs, and confirmed they had successfully downloaded. This whole process—searching, reviewing, downloading, and confirming the download—took Roush 4.9 hours. Roush did not edit or redact the videos. Roush then gave the DVDs to Perez.

Perez reviewed the videos to determine whether they contained material exempt from disclosure under the PRA. After a cursory review, he concluded they contained exempt material, including personal medical information and law enforcement tactical security measures.[2] (See Gov. Code, § 6254, subds. (c), (f).) After researching the best means for removing exempt audio and visual material from the videos, Perez downloaded the free video-editing software Windows Movie Maker. Perez quickly realized that editing 90 hours of video would be unduly burdensome, so, through the City Attorney's Office (City Attorney), the Department asked NLG to narrow its request. NLG complied, requesting six specific hours of video from the demonstrations. Perez worked with Roush to identify the six hours of video on Evidence.com and to download the videos to DVDs. The City did not charge NLG for any of Perez's or Roush's staff time completing these tasks.

With the narrower set of videos in hand, Perez began the editing process. First, he identified the exact visual and audio segments that were exempt. Next, he used Windows Movie Maker to remove all exempt audio and visual material from the video files. Before he could remove the exempt audio segments,

---

[2]     NLG does not challenge the City's determination that certain portions of the videos are exempt under the PRA.

he had to separate the audio and visual material by taking out all of the audio material from each MP4, saving that audio material as an MP3, and reuploading the MP3 audio file into Windows Movie Maker. Last, he saved the edited videos as new MP4 files and downloaded them to a thumb drive storage device. This editing process took Perez 35.3 hours.

The City Attorney then informed NLG that the videos were available for pickup. But the City Attorney warned NLG that before anyone could pick up the videos NLG would need to pay the City's costs to produce the videos. The City invoiced NLG $2,938.58[3]—$1 for the "DVD" (actually a thumb drive) containing the edited video copies and the remainder for 40.2 hours of staff time spent preparing the videos for production, consisting of 4.9 hours of Roush's time and 35.3 hours of Perez's time, as detailed above. NLG paid the invoiced amount under protest and received the videos.

Soon after, NLG requested additional footage from the demonstrations. The City's staff followed substantially the same procedure outlined above to identify and edit the videos.[4] The City invoiced NLG $308.89 for the $1 "DVD" and the staff

---

[3]   The record shows that the City invoiced NLG $2,938.55. But the parties, the pleadings, and the trial court all state the invoiced amount as $2,938.58, so for present purposes we will also spot the parties the extra 3 cents.

[4]   Though Perez edited the second set of responsive videos, the record indicates the videos were located in Evidence.com by Chris Gomes, not by Roush. The record does not indicate whether Gomes followed the same process as Roush in locating the videos and whether his time was similarly billed. But because none of the parties has raised the point, we will assume there were no material differences in the handling of the second set of videos.

time to produce the videos. NLG again paid the amount under protest, and the City produced the videos to NLG.

After requesting the second set of videos, but before receiving them, NLG filed a petition for declaratory and injunctive relief and writ of mandate against the City and relevant City officials (collectively, Hayward). NLG sought a refund of the money it had paid to receive the first set of videos and a writ of mandate or injunction requiring immediate production of the second set of videos without costs beyond those necessary to copy the videos. Later, after paying for and receiving the second set of videos, NLG moved for a peremptory writ of mandate, arguing that Hayward's charges were excessive and seeking a refund of the money it had paid beyond the direct costs of duplicating the videos. Hayward argued in response that the invoiced costs were justified under the PRA because the City's staff had performed data extraction and compilation, as allowed under section 6253.9, subdivision (b)(2) (section 6253.9(b)(2)).[5]

The trial court disagreed with Hayward, holding that "the phrase 'data compilation, extraction, or programming to produce the record'" does not include "making a redacted version of an existing public record." Instead, this exception "applies only

---

[5] Hayward also argued the costs were justified under Government Code section 6255 (section 6255), the PRA's "catchall exemption." (*Id.*, subd. (a) ["The agency shall justify withholding any record by demonstrating . . . that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."].) The trial court disagreed, and Hayward did not appeal that ruling. (*National Lawyers Guild v. City of Hayward* (2018) 27 Cal.App.5th 937, 945, fn. 5 (*National Lawyers Guild*).)

when a []PRA request requires a public agency to produce a record that does not exist without compiling data, extracting data or information from [an] existing record, or programing a computer or other electronic devise [*sic*] to retrieve the data." The trial court thus found that Hayward's charges were unjustified and granted the petition for writ of mandate, directing Hayward to refund to NLG the charges for the City's staff time.

The Court of Appeal reversed, agreeing with Hayward that section 6253.9(b)(2) entitled Hayward to recover its costs for redacting the videos as an "extraction" of data necessary to produce the record. (*National Lawyers Guild*, *supra*, 27 Cal.App.5th at p. 941.) Finding the meaning of the term "extraction" to be ambiguous, the Court of Appeal relied on the legislative history of section 6253.9(b)(2). The court explained that before subdivision (b)(2) was added to the bill enacting section 6253.9, several groups had opposed the bill on grounds that it failed to address the costs of redacting electronic records; after subdivision (b)(2) was added, most of the opposition was withdrawn. The court concluded from this that "lawmakers were . . . aware the cost of redacting exempt information from electronic records would in many cases exceed the cost of redacting such information from paper records," and therefore chose to make redaction costs recoverable under section 6253.9(b)(2). (*National Lawyers Guild*, at p. 951.) The court thus held that Hayward could recover its costs to construct a copy of the police body camera video recordings for disclosure purposes, including the "costs to acquire and utilize special computer programming (e.g., the Windows Movie Maker software) to extract exempt material from otherwise disclosable electronic public records." (*Ibid.*) We granted review.

## II.

## A.

The issue before us is one of statutory interpretation, so we begin by looking to the statutory language. If the language is clear in context, our work is at an end. If it is not clear, we may consider other aids, including the statute's legislative history. (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165–166 (*Sierra Club*).)

The PRA provides that public agencies may recover the costs associated with producing a copy of an electronic record, "including the cost to construct a record, and the cost of programming and computer services necessary to produce a copy of the record" (§ 6253.9, subd. (b)) when "[t]he request would require data compilation, extraction, or programming to produce the record" (§ 6253.9(b)(2)). The question here is what the Legislature meant by the term "extraction." The PRA does not define the term. Hayward argues "extraction" ordinarily is used to mean "taking something out," a usage broad enough to cover the act of redacting information from an electronic record before that record is released to the requester. By contrast, NLG argues the term "extraction" refers, in context, to a process of retrieving responsive information from a government repository in order to produce the responsive information in a newly constructed record. On this narrower understanding, extraction costs would include, for example, exporting responsive data from a large government database into a spreadsheet in order to produce the spreadsheet, but they would not include time spent redacting personally identifiable or other confidential information from the spreadsheet once constructed.

As the Court of Appeal in this case observed, both views find some support in common dictionary definitions of "extraction." The verb "extract" is commonly defined to mean "to draw forth" or "to pull out (as something embedded or otherwise firmly fixed) forcibly or with great effort." (Webster's 3d New Internat. Dict. (2002) p. 806 (Webster's Third).) This dictionary definition is capacious enough to encompass Hayward's broad interpretation as well as NLG's narrower one. (*National Lawyers Guild, supra,* 27 Cal.App.5th at pp. 947– 948.)[6]

But general-purpose dictionary definitions are not always the most reliable guide to statutory meaning; sometimes context suggests that the Legislature may have been using a term in a more technical or specialized way. (See, e.g., *Nelson v. Dean* (1946) 27 Cal.2d 873, 879.) Section 6253.9, subdivision (b) (section 6253.9(b)) is, broadly speaking, a technical provision; it allocates the costs of "programming and computer services" and of similar processes required to produce copies of electronic records. (*Ibid.*) The term "extraction" itself appears as the middle item in a list of such technical processes, sandwiched

---

[6]    There are, of course, other common definitions for the word "extract." One such definition, particular to the manipulation of text, is "to select (excerpts) and copy out or cite." (Webster's Third, *supra,* at p. 806; see also American Heritage Dict. (4th ed. 2000) p. 629 ["[t]o derive or obtain (information, for example) from a source"].) This definition, with its connotation of deriving materials from a source, is more consistent with NLG's narrower interpretation of "extraction" as referring to a process of selecting and pulling out responsive data from government repositories to create a producible record. But we find these common definitions less instructive than the more technical usage of the term described below.

between "data compilation" and "programming." (§ 6253.9(b)(2).) Given the evident technical focus of section 6253.9(b), it makes sense to consider the more technical usage of the term.

In the field of computing, the term "data extraction" does encompass a process of taking data out, but it is generally used to refer to a process of retrieving required or necessary data for a particular use, rather than omitting or deleting unwanted data. One computing dictionary, for example, defines the term "extract" as meaning "to remove *required* data or information from a database." (Collin, Dict. of Computing (4th ed. 2002) p. 139, italics added; cf. *id.* at p. 310 [defining "retrieve" as "to extract information from a file or storage device"].) Other technical sources define extraction similarly to mean retrieving data for further processing, analysis, or storage, as opposed to simply removing unwanted data. (See, e.g., Neamtu et al., *The impact of Big Data on making evidence-based decisions*, in Frontiers in Data Science (Dehmer & Emmert-Streib edits., 2018) p. 217 [defining "data extraction" as "[t]he act or process of retrieving data out of (usually unstructured or poorly structured) data sources for further data processing or data storage"].) This more technical meaning is familiar in modern parlance, as numerous judicial opinions attest. (E.g., *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1105 [using "data extraction" to refer to retrieving information from criminal defendant's cell phone]; *Vasquez v. California School of Culinary Arts, Inc.* (2014) 230 Cal.App.4th 35, 43 ["Under federal law, a nonparty cannot avoid complying with a subpoena seeking electronically stored information on the ground that it must create new code to format and extract that information from its existing systems."].)

NLG's view aligns with this more technical usage of the term "extraction," as well as with the particular context in which the term appears in section 6253.9(b)(2). Understood in this more technical way, the term "extraction" conveys an idea unique to the production of electronic records. It generally refers to a particular technical process—a process of retrieving data from government data stores—when this process is "require[d]" (§ 6253.9(b)(2)) or "necessary to produce" a record suitable for public release (§ 6253.9(b)).

The process to which Hayward refers, by contrast, is not unique to the field of electronic records; redacting exempt material is a process common to the production of virtually every kind of public record, whether in paper or electronic format. The PRA has long had a term for this process: "deletion." (Gov. Code, § 6253, subd. (a) [requiring public agencies to allow inspection of "[a]ny reasonably segregable portion of a record . . . after deletion of the portions that are exempted by law"].) The Legislature's decision to use "extraction" instead of "deletion" when it enacted section 6253.9(b)(2) suggests an intent to convey a different idea. (See *Rashidi v. Moser* (2014) 60 Cal.4th 718, 725 (*Rashidi*) [" 'Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning.' "].)[7]

---

[7] In fact, when the Legislature added the term "extraction" to section 6253.9(b)(2), it did the same to section 6253, the provision that provides for the "deletion" of exempt material. (Gov. Code, § 6253.9, subd. (a).) Section 6253, subdivision (c)(4), which was also added by the 2000 amendment, provides that the

As a practical matter, reading section 6253.9(b)(2) to cover the costs of redacting electronic records would create peculiar distinctions between paper records and electronic ones. It would mean, for example, that an agency could charge for the time spent redacting an electronic version of a document even though it could not charge for time spent redacting a hard copy of the very same document. (See Gov. Code, § 6253, subd. (b); *North County*, *supra*, 23 Cal.App.4th at p. 148.) Given that section 6253.9 was enacted in large part to provide a less expensive alternative to paper production, an interpretation that would allow agencies routinely to charge requesters more for the electronic version seems unlikely.

Responding to this concern at oral argument, counsel for Hayward emphasized that one general definition of "extraction" refers not just to "taking something out," but to "taking out" with "special effort." Counsel suggested we could therefore construe section 6253.9(b)(2) to mean that redaction costs may be shifted to the requester if, but only if, a court finds that special effort was required to redact the record given technology reasonably available at the time. So, for example, a court could conclude that section 6253.9(b)(2) covers the cost of redacting the videos here (because of the significant staff time and effort required to operate the editing program), but that the statute would not

deadline for responding to a PRA request may be extended because of "unusual circumstances," including "[t]he need to compile data, to write programming language or a computer program, or to construct a computer report to extract data." (*Id.*, § 6253, subd. (c)(4), added by Stats. 2000, ch. 982, § 1, p. 7141.) The Legislature's use of both "deletion" and "extract" in the very same section of the statute reinforces the conclusion that the terms were intended to convey distinct meanings. (See *Rashidi*, *supra*, 60 Cal.4th at p. 725.)

cover redacting records in PDF, a task that is much simpler and requires less specialized technology and expertise. Moreover, courts could conclude that redactions that count as "extraction" today may not count as "extraction" tomorrow: Although the video redaction at issue here might have required special effort in 2015, advances in technology may one day make video redaction more routine and thus not chargeable as data extraction costs.

We doubt the Legislature intended us to read quite so much into the bare term "extraction." A different provision of the PRA, section 6255, does permit courts to consider context-specific burdens associated with particular requests in deciding whether and how an agency must respond. (See § 6255, subd. (a) ["The agency shall justify withholding any record by demonstrating . . . that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record."].) But section 6253.9(b)(2) does not resemble section 6255. Nothing in section 6253.9(b)(2) suggests it was intended to require a similar inquiry solely for purposes of cost shifting, with redaction costs deemed recoverable or not depending on a court's case-specific evaluation of how hard it was for agency officials to perform the redactions under current technological conditions.

Whatever problems its own interpretation may have, Hayward argues that NLG's interpretation is unsupportable insofar as it would limit "extraction" to responses requiring the retrieval of data for purposes of constructing a record for public release. In Hayward's view, this should be a null set, because, as a general rule, the PRA (like the federal Freedom of Information Act, on which the PRA was based) does not require

agencies to "create new records to satisfy a request." (*Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 665 (*Sander*).)

Hayward's argument misunderstands the rule described in *Sander*. The PRA does sometimes require agencies to construct records for public release. Section 6253.9(b) provides, after all, that a "requester shall bear the cost of producing a copy of the record, including the cost to *construct a record*." (Italics added.) This language would serve no purpose if agencies were not, in appropriate circumstances, in fact required to construct records.

The rule to which Hayward refers is not a general prohibition on constructing records, as such, but rather a prohibition on requiring agencies to generate new substantive content to respond to a PRA request. The rule means that, for example, agencies need not draft summary or explanatory material, perform calculations on data, or create inventories of data in response to a records request. (See, e.g., *Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1075 ["Preparing an inventory of potentially responsive records is not mandated by the []PRA."]; see also, e.g., *NLRB v. Sears, Roebuck & Co.* (1975) 421 U.S. 132, 161–162 ["The [Freedom of Information] Act does not compel agencies to write opinions in cases in which they would not otherwise be required to do so. It only requires disclosure of certain documents which the law requires the agency to prepare or which the agency has decided for its own reasons to create."]; *Students Against Genocide v. Department of State* (D.C. Cir. 2001) 257 F.3d 828, 837 [rejecting argument that agencies must "produce new photographs at a different resolution in order to mask the capabilities of the reconnaissance systems that took them"].) But the rule does not mean that an agency may disregard a request for government

information simply because the information must first be retrieved and then exported into a separate record before the information can be released.

*Sander*, *supra*, 26 Cal.App.5th 651, itself explained the distinction. Plaintiffs there requested records reflecting California Bar Examination applicants' personally identifying characteristics, like race, law school, grade point average, bar exam score, and year of law school graduation. (*Id.* at p. 655.) To protect applicant privacy, the requester-plaintiffs proposed four different protocols the agency could use to "de-identify or 'anonymize'" the data requested. (*Id.* at p. 658.) Each of these protocols "'require[d] the State Bar to recode its original data into new values'" (*id.* at p. 667 [quoting trial court]), including through "recoding and binning"[8] data (*id.* at p. 659), "[data] suppression (removing information from data that might be identifying), adding 'random noise,' scrambling data or generalizing fields of information, or swapping values for generalized values" (*id.* at p. 660). In rejecting these proposals as outside the scope of the PRA, the court held the PRA does not require "reprogramming computerized data to create new records"—that is, it does not require agencies to "undertake programming that would assign new or different values to existing data, replace groups of data with median figures or variables, and collapse and band data into newly defined categories." (*Id.* at p. 669.) By contrast, the court recognized, the PRA does require agencies to gather and segregate disclosable electronic data and to "perform data compilation,

---

[8] "Binning refers to the practice of grouping and segregating data of reasonably equivalent values into a single group or set." (*Sander*, *supra*, 26 Cal.App.5th at p. 659, fn. 3.)

extraction or computer programming if 'necessary to produce a copy of the record.'" (*Ibid.*, quoting § 6253.9(b).) But "segregating and extracting data is a far cry from requiring public agencies to undertake the extensive 'manipulation or restructuring of the substantive content of a record'" the requester in that case had proposed. (*Ibid.*) Put differently, the PRA does not relieve agencies of the obligation to retrieve data to construct disclosable records; it instead protects them from any obligation to generate new substantive content for purposes of public release. NLG's interpretation is perfectly consistent with that requirement.

In short, NLG's interpretation is more than supportable; it is the interpretation that more readily comports with the statutory text. Under that interpretation, section 6253.9(b)(2) permits the shifting of costs uniquely associated with the production of electronic record copies—including, as relevant here, the need to retrieve responsive data in order to produce a record that can be released to the public—but not the costs of redacting exempt information from the record. This interpretation fits with the typical usage of the term "data extraction," as well as with the usage of the term in related statutory provisions. Even so, the statute does not wholly foreclose Hayward's argument for shifting redaction costs, so we may consider other indicia of the Legislature's intent to determine the meaning of the statute. (See *Sierra Club*, *supra*, 57 Cal.4th at p. 166.)

**B.**

We turn, then, to the legislative history. As explained above, before the Legislature enacted section 6253.9, agencies had discretion to produce electronic records in any format they

wished.  (Gov. Code, § 6253, subd. (b), added by Stats. 1998, ch. 620, § 5, p. 4120.)  Many agencies exercised this discretion to convert electronic records, which were often inexpensive to produce, into paper records, for which the agencies could recover often greater "direct costs of duplication" under Government Code section 6253, subdivision (b).  (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2799, *supra*, as amended June 22, 2000, p. 3.)  The central purpose of the bill that enacted section 6253.9 was to "ensure quicker, more useful access to public records" by cabining this discretion.  (Assem. Com. on Governmental Organization, Analysis of Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as introduced Feb. 28, 2000, p. 2.)  To fulfill this purpose, the bill required electronic records to be produced in electronic format.  As a general rule, agencies would recover only the costs of duplication, just as they do when they produce paper records.  But the bill was amended in June 2000 to add the special costs provision we are concerned with here:  If data compilation, extraction, or programming was required to produce the record, the agency was entitled to recover the costs to perform those tasks.  (See Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as amended June 22, 2000, pp. 5, 7; § 6253.9(a)(2), (b)(2).)

Nothing in the legislative history explains precisely what the Legislature meant by its use of "extraction" in the special costs provision, but this omission is itself telling.  The overarching motivation for section 6253.9 was to improve access to electronic records by capitalizing on the relatively less expensive mechanisms for duplicating electronic records, as opposed to paper ones.  As NLG reads the statute, section 6253.9(b)(2) was designed to create a narrow allowance for greater cost shifting based on the kinds of expenses that are

unique to information kept in electronic format. Under Hayward's interpretation, by contrast, section 6253.9(b)(2) was designed to generally increase cost shifting for electronic records relative to paper records by making redaction costs recoverable for the former but not the latter. Given the overarching motivation for the provision, if the Legislature had intended to create such a disparity, we might expect the history to contain some affirmative indication of that intent. But it does not.

To the extent we can discern anything instructive from the legislative history, the lessons are generally consistent with NLG's view that the Legislature was primarily concerned with the costs of retrieving information from government stores, as opposed to time spent redacting exempt information. For example, in discussing Government Code section 6253, subdivision (c)(4)—the provision extending time limits for responding to records requests where data extraction is required—the Senate Judiciary Committee bill analysis noted that "sometimes the information or data requested is not in a central location nor easily accessible to the agency itself, and thus would take time to produce or copy." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2799, *supra*, as amended June 22, 2000, p. 9.) It is fair to conclude that when the Legislature used the term "extraction" in section 6253.9(b)(2), it was similarly concerned with the process of retrieving requested data that was not easily accessible in order to produce it, as opposed to redacting exempt material.

Hayward points to other portions of the legislative record in an effort to show the Legislature intended "extraction" to cover redaction costs. Hayward argues, and the Court of Appeal agreed, that this intent can be fairly discerned by considering the views of certain outside groups that had objected to an

earlier version of the bill that did not contain subdivision (b)(2). Before subdivision (b)(2) was added to section 6253.9 in June 2000, these groups opposed the bill because, among other things, it failed to account for costs associated with redacting exempt information from electronic records; after the amendment was added, many of these groups withdrew their opposition. From this, Hayward infers that subdivision (b)(2) was intended to assuage opponents' concerns by allowing agencies to shift the costs of electronic redactions to requesters.

Nothing in the record supports this inference. The opposition letters, of course, reflect only the opinions of their writers—all interested outside parties—and not those of the Legislature. (See *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 723 ["letters state the views of the writers, not the intent of the Legislature," absent "support for [the proposed] interpretation from any source within the Legislature itself"]; *Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 238, fn. 6; cf. *People v. Dennis* (1998) 17 Cal.4th 468, 501, fn. 7 [declining to take judicial notice of letters in support of a bill in part because they "simply state[d] the views of two groups specially interested in supporting the bill's passage"].) Hayward does point to a pre-amendment "Question and Answers" sheet by the bill's author acknowledging the letter writers' concerns. But nothing in that document, or any other document in the available legislative history, indicates the Legislature shared— much less acted on—the writers' concerns about the costs of electronic redaction.

Nor is it fair to infer from the timing that subdivision (b)(2) must have been added to section 6253.9 to respond to redaction cost concerns, as opposed to any of the other concerns raised by

23

opponents of the bill. Those other concerns included worries about the cost of producing responsive data stored in massive databases. (See Violet Varona-Lukens, California Association of Clerks and Election Officials, letter to Assemblywoman Carole Migden, May 11, 2000, p. 2 [raising concern that bill failed to address costs of providing requested information that, "due to the size or complexity of the database from which the information is extracted," would be "extremely burdensome to provide . . . 'on demand' "]; see also Assem. 3d reading analysis of Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as amended May 23, 2000, p. 3 [acknowledging concern of some commentators that, before June 2000 amendments, bill did not address costs of "separating disclosable electronic records from nondisclosable electronic records" "retain[ed] [in] massive databases"].) It is entirely possible that the bill's opponents succeeded in persuading the Legislature to address this concern about the costs of retrieving responsive information from large electronic repositories, but failed in their efforts to secure an amendment that would have shifted redaction costs as well.

It is true, as Hayward notes, that many of the groups that had previously opposed the bill withdrew their opposition after subdivision (b)(2) was added to section 6253.9. But the withdrawal letters do not reflect an understanding that the new provision would cover redaction costs. Neither did the author nor the bill's sponsor ever mention that the amendments would allow agencies to charge for redaction costs. By contrast, at least one bill analysis suggests the bill as amended would not cover redaction costs. That analysis noted the amended bill's "fiscal effect" would include "[p]otential costs . . . for workload in redacting nondisclosable electronic records from disclosable electronic records," without mentioning the possibility that

24

public agencies might recover some of those costs by charging requesters for time spent redacting exempt material. (Assem. Conc. Sen. Amends. to Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as amended July 6, 2000, p. 2.)

In sum, the legislative history offers little support for Hayward's proposed interpretation of section 6253.9(b)(2)'s extraction costs provision as covering the costs of redacting electronic records. But it does clearly reflect other concerns, including the difficulties associated with retrieving responsive data from massive, potentially intractable databases. The language of section 6253.9(b)(2)—which permits charging requesters for the cost of "extract[ing]" data to produce or construct electronic records—is consistent with that narrower focus.

Neither the text of section 6253.9 nor its history permits us to comprehensively catalog what types of processes will or will not qualify as "extraction" within the meaning of the statute, but they do provide some guideposts. As the legislative history makes clear, the term is designed to cover retrieving responsive data from an unproducible government database— for example, pulling demographic data for all state agency employees from a human resources database and producing the relevant data in a spreadsheet. But the term "extraction" does not cover every process that might be colloquially described as "taking information out." It does not, for example, cover time spent searching for responsive records in an e-mail inbox or a computer's documents folder. Just as agencies cannot recover the costs of searching through a filing cabinet for paper records, they cannot recover comparable costs for electronic records. Nor, for similar reasons, does "extraction" cover the cost of redacting exempt data from otherwise producible electronic

records. That is the conclusion that best accords with the statutory text and the history of its enactment.

## C.

To the extent any doubt remains, California's constitutional directive to "broadly construe[]" a statute "if it furthers the people's right of access" confirms our conclusion that redaction costs are not chargeable as costs of data extraction. (Cal. Const., art. I, § 3, subd. (b)(2).) All else being equal, interpreting the term "extraction" in section 6253.9(b)(2) to cover redaction costs would make it more difficult for the public to access information kept in electronic format. Redaction costs are often nontrivial. Take this case, where NLG was charged more than $3,000 for six hours of responsive video. For many requesters, such costs may be prohibitive. Article I, section 3 of the Constitution favors an interpretation that avoids erecting such substantial financial barriers to access.

Hayward counters that shifting costs to the requester would actually improve public access to electronic records. Hayward theorizes that allowing agencies to recoup redaction costs reduces the overall burden on the agency, which in turn allows the agency to (1) produce records more quickly; (2) redact records with greater fidelity to any claimed exemptions; and (3) rely less frequently on the catchall exemption in section 6255, subdivision (a), the exemption permitting agencies to withhold records where the public interest in nondisclosure "clearly outweighs" the interest in disclosure. (See *California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1451 [suggesting time and convenience concerns, in addition to cost concerns, affect public's ability to access records].)

While we do not doubt that greater funding for PRA compliance would yield many of the access benefits Hayward describes, we are not convinced that shifting redaction costs to requesters is the right way to secure those benefits under the statute. Redaction costs could well prove prohibitively expensive for some requesters, barring them from accessing records altogether. Even if higher costs to the agency mean slower disclosure rates or greater inconvenience to the requester, these burdens on access are insignificant if the alternative is no access at all.

To the extent Hayward is concerned about being made to respond to overly burdensome requests without adequate funding, the PRA does provide various solutions to ease those burdens. For example, Government Code section 6253, subdivision (a) requires agencies to disclose nonexempt portions of records only if they are "reasonably segregable" from portions exempted by law. Section 6255, subdivision (a) allows agencies to withhold records if "the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record," which may encompass requests that place undue burdens on an agency. (See *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 453 ["Section 6255 speaks broadly of the 'public interest,' a phrase which encompasses public concern with the cost and efficiency of government."].) And Government Code section 6253.1, subdivision (a)(3) allows agencies to suggest ways requesters can reduce practical barriers to agency compliance with any request—a technique Hayward appears to have used in this very case.

But no similar provisions protect requesters from costs that unduly burden their right of access to government

information. Consideration of that right favors a rule that avoids shifting routine redaction costs as a condition of gaining the access the PRA promises.[9]

Hayward argues that requests for body camera footage present unique concerns for government agencies with limited resources. We do not doubt the point. Video footage has a unique potential to invade personal privacy, as well as to jeopardize other important public interests that the PRA's exemptions were designed to protect. Redacting exempt footage can be time-consuming and costly. But section 6253.9(b)(2) is not a provision directed to body camera footage alone; it covers every type of electronic record, from garden-variety e-mails to large government databases. Whether the unique burdens associated with producing body camera footage warrant special funding mechanisms is a question only the Legislature can decide. We hold only that section 6253.9(b)(2), as presently written, does not provide a basis for charging requesters for the costs of redacting government records kept in an electronic format, including digital video footage.

## III.

Applying this understanding here, we conclude the trial court was correct to disallow the City's charges for time its staff spent responding to NLG's requests.

The City charged for Nathaniel Roush's time spent searching Evidence.com for responsive videos, reviewing videos,

---

[9]    In *Fredericks v. Superior Court* (2015) 233 Cal.App.4th 209, 238, the Court of Appeal suggested that an agency can recover costs under the PRA for "redaction of information from confidential electronic records." We disapprove *Fredericks* to the extent it is inconsistent with this opinion.

downloading them to DVDs, and confirming their download. Roush never edited the videos; more specifically, he did not extract responsive data from any video. Hayward does not argue Roush performed data extraction with respect to the videos. We agree with this implicit concession. Roush's tasks of searching Evidence.com for video records and downloading them were akin to searching a filing cabinet for responsive paper records. Such actions are not extraction under the PRA.

The City also charged for Adam Perez's time spent editing the videos. But to the extent Perez merely deleted exempt data from the videos (i.e., redacted them), he did not "extract[]" data in order to produce new videos within the meaning of section 6253.9(b)(2). This is not to say the process was entirely straightforward. As Hayward notes, to delete the exempt data, Perez separated the audio and visual material, spliced out the exempt data from each set of material, and then saved the redacted video as a new MP4. But in video-editing terms, what Perez did was not substantively different from using an electronic tool to draw black boxes over exempt material contained in a document in electronic format. As noted, the paradigmatic example of when section 6253.9(b)(2) applies is when the government agency is required to pull certain data from a large database in order to construct a record that can be disclosed to the requester. In some cases, certainly, the process to extract responsive data might also, simultaneously, separate out data that is exempt from disclosure. But this is not such a case. What Perez did was simply perform redactions of an otherwise producible record, albeit through technologically more advanced means.

Hayward raises one final argument to justify at least some of its charged costs: It argues that Roush performed "data

compilation," as the term is used in section 6253.9(b)(2), when he searched for, located, and collected the responsive videos from Evidence.com. Neither the trial court nor the Court of Appeal addressed this argument, and we decline to address it in the first instance. We thus leave this argument, and any related forfeiture issues, for consideration on remand.

## IV.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

NATIONAL LAWYERS GUILD v. CITY OF HAYWARD

S252445


Concurring Opinion by Justice Cuéllar


The majority opinion concludes that when City of Hayward employees spent hours editing out portions of digital body camera footage that were exempt from disclosure, those hours didn't fall within the ambit of data "extraction" encompassed by Government Code section 6253.9, subdivision (b)(2).[1]  I agree but write separately to stress what I take to be the limited scope of our holding, and to anticipate the somewhat distinct variations on a theme this case portends.

The California Public Records Act (PRA; § 6250 et seq.) was enacted to further "access to information concerning the conduct of the people's business," which the Legislature characterized as "a fundamental and necessary right of every person in this state."  (§ 6250.)  Allowing government agencies to charge potentially steep sums for mere redactions that must be routinely performed by municipal employees for PRA requests — fees that could very well stand as a practical obstacle to the public's right of access — would hinder that purpose. Nothing in the statute's text or context demonstrates a legislatively enacted expectation that requesters of government records pay for what Hayward employees did here:  edit the responsive videos to redact audio and visual material exempt from disclosure under the PRA.

---

[1]    All statutory references are to the Government Code unless otherwise noted.

But because such electronic data can be stored in nearly infinite ways, jurisdictions such as Hayward can respond to public records requests using technologies that continue to evolve. Imagine a not-so-distant future when government entities deploy more thoroughly automated, artificially intelligent systems for responding to PRA requests. Such systems would likely weave into a nearly seamless quilt — either because of the software's design and functionality, or because of how the relevant data were classified — the search of government databases for responsive records, their extraction from the databases, and the editing of portions of the data exempt from disclosure. Such technology could readily help agencies be more accurate, efficient, and thorough in responding to public records requests — and allow members of the public to receive quicker access to government records. (See Gomez, *MuckRock Request Data Shows Big Difference in Backlogs Between States* (Mar. 21, 2019) Muckrock <https://www.muckrock.com/news/archives/2019/mar/21/feature-state-data/> [as of May 26, 2020] [average response times for state public records requests filed through one organization range from 11 days in Vermont to 148 days in Oregon].)[2]

This technology will also merit nuanced application of statutory provisions such as the one at issue here. A "paradigmatic example of when section 6253.9(b)(2) applies" and requires payment to the relevant government agency, the majority opinion explains, is when the agency "pull[s] certain data from a large database in order to construct a record that

___

[2] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

can be disclosed to the requester." (Maj. opn., *ante*, at p. 29.) What our opinion does not address is how the statute ought to be interpreted if *that* function becomes part and parcel of tasks not encompassed by "extraction" — such as editing exempt material from responsive records. Consider, for example, software that surveys records replete with metadata about matters such as physical location and time, isolates responsive records, and retrieves only those portions of the records that are relevant and not subject to an exemption under the PRA — without ever having to delete information from an existing file. (See maj. opn., *ante*, at p. 15 [government agencies may not charge requesters for the deletion of material exempt from disclosure under the PRA].)

Someone eventually needs to pay for the development, refinement, and maintenance of such technologies — even in a world where people and firms extensively use open source software and loss leading products. Although certain now-familiar business models pivot on presenting the monetary costs of these systems to users as low enough to appear negligible or even nonexistent, such products may impose a host of subtle or unexpected costs in other forms. As we've observed, products that "attract[] users with 'free' and low-priced services" may in fact lock in dependence on expensive support services, or enable private companies "to mine, exploit, and market their users' data to third parties." (Day & Stemler, *Infracompetitive Privacy* (2019) 105 Iowa L.Rev. 61, 63, fn. omitted; see also Newman, *The Myth of Free* (2018) 86 Geo. Wash. L.Rev. 513, 563 [product users "systematically underestimate the amount of information costs they are willing to incur in exchange" for products that are advertised as "free"].) That software offered by such business models may be suitable for public agencies in some situations

doesn't remotely mean it would make sense in every instance. (See, e.g., Paquette et al., *Identifying the Security Risks Associated with Governmental Use of Cloud Computing* (2010) 27 Gov. Inf. Q. 245, 251 ["prevent[ing] unauthorized access to both data and code" and the "[p]reservation of information and documents" are among the risks associated with the government's use of cloud services and third party software]; Schooner & Greenspahn, *Too Dependent on Contractors? Minimum Standards for Responsible Governance* (2008) 6 J. Cont. Mgmt. 9, 14 [among the challenges of privatizing government responsibilities is the dependence of agencies on contractors for service and support].) Click-wrapped gift horses are best looked in the mouth.

Government agencies willing to do so may often find that what's most consistent with their public mission is not to opt for the system with the cheapest sticker price. They may instead take best account of the full range of interests and concerns by selecting products that require subscriptions or otherwise involve greater up-front expenses but allow for greater certainty about long-term costs or otherwise evince fidelity to the civic values at stake. (Cf. Re & Solow-Niederman, *Developing Artificially Intelligent Justice* (2019) 22 Stan. Tech. L.Rev. 242, 285 [advocating for the use of technologies that are "more democratically legitimate" and advance goals other than profit maximization].) And because that technology may perform some tasks that overlap with those that constitute "compilation, extraction, or programming" of data as used in section 6253.9, subdivision (b)(2) — by culling data from a larger database, for example, to construct a disclosable record — government agencies may find it not only prudent, but well within their

statutory power, to share some of the costs of their infrastructure with requesters of government records.

I don't construe the majority opinion's interpretation of the statutory scheme to foreclose that approach. Our interpretation and application of terms such as "extraction" should avoid, to the extent possible, making pivotal distinctions based on subtle technical details of the digital architecture used by government agencies. We should instead seek to advance the interplay of legislative purpose underlying the statutory scheme. (See *Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1246–1247.) Our decision today is in that vein: It prudently recognizes that, in this particular context, Hayward may not shift its costs to records requesters for the time its employees spent redacting exempt material from digital body camera footage. Yet it continues to give leeway for government agencies to depend less on having employees cobble together edited reels of material, and more on making thoughtful choices about how best to navigate the full range of considerations relevant to making public records retrieval in the digital age as responsive and effective as possible.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** National Lawyers Guild, San Francisco Bay Area Chapter v. City of Hayward

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 27 Cal.App.5th 937
**Rehearing Granted**

_____

**Opinion No.** S252445
**Date Filed:** May 28, 2020

_____

**Court:** Superior
**County:** Alameda
**Judge:** Evilio M. Grillo

_____

**Counsel:**

Michael S. Lawson, City Attorney, Justin Nishioka, Assistant City Attorney; Jarvis, Fay & Gibson and Gabriel McWhirter for Defendants and Appellants.

Jennifer Gore and Maila Hansen for League of California Cities, California State Association of Counties and California Special Districts Association as Amici Curiae on behalf of Defendants and Appellants.

Dannis Woliver Kelley, Sue Anne Salmon Evans, William B. Tunick, Jennifer H. Choi; Kathryn Meola and Michael Ambrose for The California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants.

Law Offices of Amitai Schwartz, Amitai Schwartz; American Civil Liberties Union Foundation of Northern California, Inc. and Alan L. Schlosser for Plaintiff and Respondent.

Katie Townsend, Bruce D. Brown, Caitlin Vogus and Daniel J. Jeon for Reporters Committee for Freedom of the Press and 33 Media Organizations as Amici Curiae on behalf of Plaintiff and Respondent.

Davis Wright Tremaine, Kelli L. Sager, Dan Laidman and Selina MacLaren for California News Publishers Association and First Amendment Coalition as Amici Curiae on behalf of Plaintiff and Respondent.

McManis Faulkner and Christine Peek for Society of Professional Journalists, Northern California Chapter and Pacific Media Workers Guild as Amici Curiae on behalf of Plaintiff and Respondent.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for San Diegans for Open Government, California Taxpayers Action Network and The Inland Oversight Committee as Amici Curiae on behalf of Plaintiff and Respondent.

Rebecca Carr Miller and Richard A. Rothschild for Coalition on Homelessness, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Aid Foundation of Los Angeles, Legal Services for Prisoners with Children, Western Center on Law & Poverty and Western Regional Advocacy Project as Amici Curiae on behalf of Plaintiff and Respondent.

Jim Ewert and Nikki Moore for California News Publishers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Terry Francke for Californians Aware as Amicus Curiae on behalf of Plaintiff and Respondent.

Judy Alexander; Davis Wright Tremaine and Thomas Burke for The Center for Investigative Reporting as Amicus Curiae on behalf of Plaintiff and Respondent.

David Snyder for First Amendment Coalition as Amicus Curiae on behalf of Plaintiff and Respondent.

Barbara W. Wall for Gannett Co., Inc., as Amicus Curiae on behalf of Plaintiff and Respondent.

Jeffrey Glasser for Los Angeles Times, LLC, and The San Diego Union-Tribune, LLC, as Amici Curiae on behalf of Plaintiff and Respondent.

Juan Cornejo for The McClatchy Company as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Amitai Schwartz
Law Offices of Amitai Schwartz
2000 Powell St., Suite 1286
Emeryville, CA 94608
(510) 597-1775

Gabriel McWhirter
Jarvis, Fay & Gibson, LLP
492 9th St., Suite 310
Oakland, CA 94607
(510) 238-1400